**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**


**UNITED STATES OF AMERICA,**                                  **07-CR-437-BR**

               **Plaintiff,**                          **OPINION AND ORDER**

**v.**

**RALPH RENE WILLIAMS,**

               **Defendant.**


**KARIN J. IMMERGUT**
United States Attorney
**FREDRIC N. WEINHOUSE**
Assistant United States Attorney
1000 SW Third, Suit 600
Portland, OR  97204
(503) 727-1000

          Attorneys for Plaintiff

**RALPH RENE WILLIAMS**
SWIS# 705458
Multnomah County Inverness Jail
Portland, OR  97220

          Defendant, *Pro Se*


1- OPINION AND ORDER

**BROWN, Judge.**

This matter comes before the Court on Defendant Ralph Rene Williams's Motion to Dismiss (#48) and Motion for a *Franks* Hearing (#49).  For the reasons that follow, the Court DENIES Defendant's Motions.

## PROCEDURAL BACKGROUND

On November 15, 2007, Defendant was charged in a one-count Indictment with robbing the U.S. Bank located at 3233 North Lombard, Portland, Oregon, on August 14, 2007, taking approximately $27,976 in United States Currency in violation of 18 U.S.C. § 2113(a).

On January 14, 2008, the government filed a Motion to Continue and to Reset the Trial Date.  On January 16, 2008, the government filed a Motion to Produce DNA Sample.  That same day, Defendant filed a Motion for Hearing (Request for a *Faretta* Hearing).

At a hearing on January 17, 2008, the Court granted the government's Motion to Continue and to Reset the Trial Date finding the ends of justice warranted the continuance pursuant to The Speedy Trial Act, 18 U.S.C. § 3161(c)(1), and therefore, the delay between January 22, 2008 and February 28, 2008 was excludable delay.  The Court also granted the government's Motion to Produce DNA Sample.  The next day the Court held a scheduling

2- OPINION AND ORDER

conference to reset the trial date.  At that hearing the Court also heard argument and granted Defendant's request to represent himself; appointed Defendant's former attorney, Assistant Federal Public Defender Thomas J. Hester, to serve as advisory counsel; and reset the trial to February 28, 2008.

On January 25, 2008, Defendant filed a Motion to Dismiss the Indictment in which he argued the government violated his right to a speedy trial pursuant to 18 U.S.C. § 3161(c)(1) by failing to commence trial on the first setting.  The Court construed this Motion as a request to reconsider the Court's ruling on January 17, 2008, and reset the trial date to February 28, 2008. The Court adhered to its original ruling.

On January 28, 2008, Defendant filed the pending Motions in which he moves the Court for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), for the purpose of challenging the sufficiency of the Affidavit that was the basis for the search and arrest warrants.


## FINDINGS OF FACT

The Court finds the following facts by a preponderance of the evidence:

1.   On October 23, 2007, Federal Bureau of Investigation (FBI) Special Agent Brandon L. Walter prepared an Affidavit in support of an application for a warrant to search Defendant's

residence and automobiles located at 4201 N.E. 125th Place, #154,
Portland, Oregon 97230.  Based on the allegations and
affirmations in this Affidavit, United States Magistrate Judge
Donald C. Ashmanskas issued a warrant the same day.

    2.  The Affidavit sets forth the following significant
facts:

        a. On August 14, 2007, at approximately 9:07 a.m., a
911 call was placed from a phone booth at N.E. Church Street and
N.E. Martin Luther King, Jr. (MLK) Boulevard in Portland.  The
male caller asserted he was part of a team that was in the
process of robbing the Wells Fargo Bank at 5730 N.E. MLK and the
U.S. Bank at 5505 N.E. MLK.  The caller stated the robberies were
occurring concurrently and involved five robbers in one bank and
six in the other.  Portland Police Bureau (PPB) officers
responded to both banks and found neither one had been robbed
that morning.  A recording of the 911 call was later played for
Defendant's United States Probation Officer, Eileen Groshong, who
noted similarities in speech pattern and tone between the caller
and Defendant.  She could not, however, definitively identify the
caller as Defendant.

        b.  On the same day, and about 20 minutes after the 911
call, a robber entered U.S. Bank at 3233 N. Lombard Street from a
door located at the northeast corner of the building and placed a
"Coke" crate in the doorjamb to prevent the door from closing.

The robber walked to the teller counter, placed a camping stool
on the floor, and climbed onto the countertop.  He then reached
over the bullet-proof barrier; pointed a handgun at the tellers
while verbally threatening to shoot them; and demanded money in
$100, $50, and $20 denominations.  The robber also addressed the
"merchant teller" individually and warned him not to include any
"bait" or "dye" money.  After the tellers handed over the money,
the robber exited through the same door that he entered and
departed northbound on foot.

c.  At the time it was robbed, the U.S. Bank at 3233 N.
Lombard Street was insured by the Federal Deposit Insurance
Corporation (FDIC).  The bank's FDIC certificate number is 6548
and dated 09/19/2001.

d.  An audit conducted immediately after the robbery
revealed the robber stole $27,976 in United States currency.  Ten
"bait bills" were taken in the form of five $10 bills and five
$20 bills.

e.  All four tellers interviewed by officers on the day
of the robbery stated the robber was wearing a dirty or sandy
blond wig and sunglasses.  Two tellers said the sunglasses were
mirrored or metallic, and one teller said the lenses were gold or
yellow.  More than one teller described the robber as wearing a
red or orange jacket and black pants.  Two tellers said the
robber was wearing purple gloves.  All of the tellers reported

the lower half of the robber's face was covered by something:
three tellers described it as a multi-colored bandanna and one
teller said is was a plaid bandanna.  Two tellers thought the
robber sounded like a black man even though they reported the
robber was "not black" or that he had "olive skin."

      f.  A loan officer, an assistant manager, and a
customer were also interviewed by officers on the day of the
robbery.  They each recalled the robber was wearing a wig.  The
assistant manager reported the robber was wearing purple gloves.
The customer reported the robber was wearing a red shirt.  The
loan officer and the assistant manager concurred with the two
tellers who said the robber sounded like a black man.

      g.  A black-and-white bank surveillance videotape from
August 14, 2007, shows the robber entering the bank at
approximately 9:27 a.m.  The camping stool and a dark-colored bag
can be seen on the floor in front of the teller counter while the
robber is standing on the countertop.  The robber is wearing
sunglasses; a plaid print bandanna across the lower part of his
face; and what appears to be a light-colored, messy wig.

      h.  The robber left behind the camping stool and "Coke"
crate, which PPB Officers processed for latent fingerprints.  A
latent print lifted from the "Coke" crate was entered into the
Automated Fingerprint Identification System (AFIS), but it did
not result in any matches.

i.  Jesse Reguera, a witness outside of the bank, observed a man standing behind a residence at 7808 N. Emerald Avenue, which is located about a half block from the U.S. Bank in the direction the robber fled.  Investigators searched this area and found a pair of "wrap-around" Smith and Wesson sunglasses and a dirty blond wig located in a five-gallon bucket next to a shed behind the residence.  In the alley that runs behind 7808 N. Emerald Avenue, investigators also found a piece of a purple medical glove in the weeds near an electrical transformer box located behind the fence at 7632 N. Emerald Avenue.

j.  On August 15, 2007, investigators responded to a tip received from an employee of Spar-Tek Industries, which is located approximately one mile from the U.S. Bank.  The employee, Denise Guyette, had seen a news story about the robbery the day before in which it was reported the robber had worn purple medical gloves during the robbery.  Ms. Guyette reported on August 14, 2007, that she had seen purple medical gloves and a pair of black shoes on the pavement in the east parking area of Spar-tek.  Investigators were unable to locate the gloves and shoes, but they found a number of items in a wood recycling dumpster adjacent to the area, including a red-and-black jumpsuit, a multi-colored bandanna, a washcloth, a Goodwill plastic sack, and a PPB Traffic Crash Exchange Report (which did not relate to Defendant).  The washcloth appeared to have a

"light-brown" or white skin-tone substance on its surface.

Investigators interviewed other Spar-Tek employees and discovered another employee, Harlan Bishop, also remembered seeing a black Nike shoe in the parking lot the day of the robbery. John Mrowiec observed a similar shoe two blocks away near the curb in front of Lovett Deconstruction located at 2030 N. Willis Blvd. Mrowiec led investigators to this location and found a black Nike shoe.

k. The Goodwill plastic sack was taken to the PPB Identification Division for fingerprint analysis. It did not have sufficient fingerprint detail for an identification.

The wig, sunglasses, washcloth, bandanna, and purple medical glove fragment were taken to the Oregon State Police Forensic Laboratory (OSPFL) for DNA analysis. The OSPFL scientist who analyzed this evidence noted each item had a "light-brown" substance adhering to its surface, which is consistent with white skin-tone make-up. The following DNA results were obtained:

(1) Washcloth - a male DNA profile was recovered (male #1) and a female DNA profile was recovered (female #1).

(2) Scarf/bandanna - a male DNA profile consistent with male #1 was recovered.

(3) Purple medical glove fragment - a partial male DNA profile consistent with male #1 was recovered.

8- OPINION AND ORDER

(4) Sunglasses - A partial male DNA profile was recovered that was not consistent with male #1 (hereinafter "male #2").

(5) Wig - DNA from multiple people was recovered from the wig, including DNA consistent with male #1, male #2, and female #1. Due to this mixture, DNA database comparisons could not be made.

When the profiles of male #1, male #2, and female #1 were searched against the Oregon State Police Forensic DNA database, no matches were found. When searched against the FBI National DNA database, both the male #1 and female #1 profiles matched profiles on file.

The male #1 profile matched that of Robert Tellaferro Williams, date of birth 12/08/1950, FBI #703059H. The female #1 profile matched that of Audrey B. Kishline, date of birth 11/09/1956, SID:WA 19976832.

l. After DNA and fingerprint testing of the evidence was completed, investigators reinterviewed witnesses to see whether they recognized the items. The bank manager and four tellers each took a turn entering an isolated room to view the items. All five of them said the wig was the one worn by the robber based on its color, texture, and condition. One teller was 99 percent certain the plaid bandanna was the one worn over the robber's face. This teller was the same one who described

the bandanna on the day of the robbery as plaid.  Two tellers and
the assistant manager said they thought the bandanna worn by the
robber was more colorful.

      m.  Robert Tellaferro Williams utilizes various
aliases, including Ralph Rene Williams, Ralph Renah Williams,
James L. Harris, Ralph Rennie Williams, Ralph Renal Williams,
R. Renah Williams, and Renah R. Williams.

      n.  The Oregon Department of Motor Vehicles (DMV)
records show a R. Renah Williams on file with a date of birth of
12/08/1950 and a description as 6 feet 1 inch tall and 200
pounds.  The driver's license photograph on file was taken
December 23, 2004, and shows Williams is a black male with brown
eyes and a dark-brown/black mustache.  The driver's license
number is 7133142.

      o.  A criminal-records check of Williams revealed his
first criminal conviction was in December 1970 and that he has
been involved in weapons crimes, drug possession, forgery of
credit cards and documents, armed robberies, burglaries, escape
from custody, aiding and abetting in multiple credit-union
robberies, felon in possession of a deadly weapon, assault with a
deadly weapon, possession of stolen property, and multiple bank
robberies in several states.

      On August 14, 2007, Williams was on supervised release
for a bank robbery committed in Portland in November 1988 during

10- OPINION AND ORDER

which he used language similar to the robber of the U.S. Bank on August 14, 2007, such as demanding money in 100, 50, and 20-dollar bills.

According to Williams's Probation Officer, Eileen Groshong, Williams tested positive for drugs on August 6, 10, and 20, 2007, and admitted he had been smoking crack that month. As a result, Groshong directed Williams to enter either a drug-treatment program or to return to prison.  Williams entered the Willamette Family, Inc., treatment center in Eugene, Oregon, on August 29, 2007.  Groshong remembers before Williams entered the treatment facility, he was preoccupied with finding an apartment and a place to keep his belongings because he was being evicted from his duplex at 77 N.W. 188th in Portland.  This duplex is owned by the brother of Audrey Kishline, Williams's girlfriend at the time.

p.  The resident manager and assistant manager of the Willow Springs Apartments located at 4201 N.E. 125th Place in Portland told investigators that "a Williams" rented and moved into an apartment on August 22, 2007.  He used three money orders to pay a $695 deposit, $209 in prorated rent for the remainder of August, and $695 for September rent.  The assistant manager showed Agent Walter a copy of the driver's license that Williams provided at the time he rented the apartment.  He also told Agent Walter that Williams stated he owned a black 1999 Pontiac Grand

11- OPINION AND ORDER

Am bearing Oregon license plate YXH-922.  Investigators saw a vehicle bearing this description with Oregon license plate WXH-922 parked in the Willow Springs Apartment parking lot the day they interviewed the managers.

q.  An Oregon DMV records check revealed the 1999 Pontiac Grand Am, VIN 1G2NW52E6XM790972, had recently been in the possession of a used-car lot called Magos Auto Sales located at 150 S.E. 82nd Avenue in Portland.  The manager, German Diaz, told investigators that he remembers a similar vehicle being sold from the lot.  He searched the computer database, which revealed that salesman Marcelino Lopez sold a Grand Am to Renah R. Williams on August 15, 2007 for $5000 cash.  The asking price was $8995, but Lopez told investigators that he made the deal because Williams produced $5000 cash (in $100, $20, $10, and $5 denominations).  Lopez also recalled Williams stated he had been "saving money for years" and that he had a white female companion.

Diaz showed Agent Walter copies of the Oregon driver's license that Williams used, which was consistent with the described information on file at the DMV.  Williams, however, listed a different address than the Willow Springs address (77 N.E. 188th Avenue) as well as cell phone number 503-962-0267 and Social Security number 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.

r.  Agent Walter also discovered Williams, together with his brother Charles Anthony Williams, is the co-owner of a

12- OPINION AND ORDER

silver and gold 1985 Lincoln, VIN 1MRBP98F1FY660251.  Washington
State DMV records revealed this vehicle was sold on May 14, 2007.
The Oregon DMV, however, was still processing the title change.
The vehicle displayed Oregon license plate 043 DLR.

s.  In August 2007, Williams was employed as a Parts
Driver for NAPA Auto Parts at 430 N.E. Columbia Boulevard in
Portland.  The manager at NAPA, Paul Chully, told investigators
that Williams did not show up for his 8:30 a.m. shift until
12:07 p.m. on August 14, 2007.  A time detail for Williams shows
a "Late-Unexcused" punch-in on August 14, 2007, and indicates
Williams worked from 12:07 p.m. to 5:06 p.m. that day.
Additionally, NAPA time records show Williams did not report to
work on August 15, 2007.

3.  On October 25, 2007, Agent Walter prepared an Affidavit
in support of an application for a warrant to arrest Williams.
Based on the allegations and affirmations in this Affidavit,
United States Magistrate Judge Donald C. Ashmanskas issued the
warrant the same day.

4.  The October 25, 2007, Affidavit includes the above facts
and sets forth the following additional facts:

a.  On October 24, 2007, at approximately 6:15 a.m.,
agents executed a search of Williams's residence at 4201 N.E.
125th Place, #154, in Portland and his 1985 Lincoln and 1999
Pontiac that were parked near the residence.  The passenger

compartment and trunk of the 1999 Pontiac contained 32 $100

bills; 80 $50 bills; a receipt dated August 15, 2007, for the

purchase of the 1999 Pontiac for $5000; and a Washington Mutual

Bank statement for an account in Williams's name indicating the

following cash deposits:  $500 on August 15, 2007; $2700 on

August 20, 2007; and $1000 on August 20, 2007.

        b.   Investigators interviewed Audrey Kishline,

Williams's girlfriend during the month of August 2007.  Kishline

stated she is an alcoholic.  Kishline reported she noticed during

that month that Williams's personality changed after they used

drugs together.  She reported she went to a Goodwill store with

Williams some time in August 2007 and watched him purchase a

"long, fuzzy, ugly" wig; a "red and white jumpsuit"; and a step

stool.  Kishline stated Williams commented that he was "not sure

if it is sturdy enough" and then watched him as he stood on the

step stool to "test" it.

        Investigators showed Kishline pictures of the wig, the

jumpsuit, the bandanna, and the step stool.  As to the bandanna

in the photograph, Kishline stated, "[That] rag, looks familiar."

Kishline stated the photograph of the jumpsuit "looks like the

jumpsuit."

        Kishline also reported she saw a gun under the bed

Williams was sleeping in during the month of August 2007, and he

told her it was a "fake, toy gun."

14- OPINION AND ORDER

Kishline stated she has an "eye and facial" condition for which she uses special make-up called Estee Lauder Ideal Matte Refinishing Makeup.  When she noticed her second bottle was missing in August 2007, Kishline asked Williams if he knew what happened to it.  He told her that he "used it."

Finally, Kishline reported Williams came home one night and dumped money on the bed and asked her to put the $100 bills and the $50 bills together and to count them.  Kishline counted $13,000.  Williams told her that he had another $8,000 in the bank.  Kishline admitted knowing that Williams had done "something," but she stated she did not act because of her drug and alcohol use.

## DISCUSSION

According to Defendant, Agent Walter misstated the following facts in his October 23, 2007, Affidavit and omitted the following material information relevant to probable cause:  (1) he misstated in the Affidavit that "confirmatory testing was performed with existing samples" after the male #1 DNA profile found on the scarf initially matched Williams's profile in the FBI database; (2) he misstated in the Affidavit that "confirmatory testing was performed with existing samples" after the female #1 DNA profile found on the washcloth initially matched Kishline's profile in the FBI database; (3) he omitted

the State Police Forensic Laboratory's September 28, 2007, statement that "DNA reference standards (four oral swabs) from Robert Williams and Audrey Kishline need to be submitted to confirm these database matches"; (4) he omitted Jesse Reguera's description of the person he saw in the alley where the sunglasses and wig were recovered, whom he described as a white male; (5) he misstated Williams's criminal history as including aiding and abetting "multiple" credit-union robberies; and (6) he misstated Williams's criminal history as including "multiple" bank robbery convictions in "several states."

The government opposes Defendant's Motions and asserts Defendant fails to show that Agent Walter knowingly and intentionally made any misstatements in his Affidavit or omitted any information material to the determination of probable cause. The government, therefore, argues Defendant is not entitled to a *Franks* hearing and the Court should not dismiss the Indictment.

## I.    The Law

In *Franks v. Delaware*, the Supreme Court held intentionally or recklessly submitting false statements in a warrant affidavit violates the Fourth Amendment.  438 U.S. 154, 164-65 (1978).  A defendant is entitled to a *Franks* hearing to determine whether the warrant was supported by probable cause only after making "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth,

was included by the affiant in the warrant affidavit." *Id*. at 155-56.  To meet his burden, the defendant must "point out specifically the portion of the warrant affidavit that is claimed to be false" and submit a statement of supporting reasons accompanied by a an affidavit or sworn statement. *Id*. at 171. *See also United States v. Ruddell*, 71 F. 3d 331, 334 (9th Cir. 1995)(the absence of an affidavit offering proof of deliberate falsehood is "enough in itself" to defeat a motion for a *Franks* hearing).  Allegations of negligence or innocent mistake will not suffice.  *Id*.

If perjury or reckless disregard for the truth is established by a preponderance of the evidence, the court must set the "false" material aside and determine whether the "remaining content is sufficient to establish probable cause." *Id*. at 156.  If the remaining content is not sufficient to establish probable cause, "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."  *Id*.

Courts have employed a similar analysis when a defendant alleges the warrant affidavit is fraught with material omissions. In *United States v. Pace*, the court found "[t]he rule of [*Franks*] prohibiting a police officer from deliberately or recklessly presenting false material information in a warrant application, also prohibits the officer from deliberately or recklessly

omitting material information from the application."  898 F.2d

1218, 1232 (7th Cir. 1990).  *See also Franks*, 438 U.S. at 171 (to

warrant an evidentiary hearing, "the challenger's attack must be

more than conclusory and must be supported by more than a mere

desire to cross-examine"); *United States v. Chavez-Miranda*,

306 F.3d 973, 979 (9th Cir.), *cert. denied,* 537 U.S. 1217

(2003)(bare assertions of deliberate omissions fall short of

the preponderance-of-the-evidence standard required by *Franks*).

## II.  Analysis

### A. Existing Samples v. Oral Swabs

According to Defendant, the following statements found on

page seven of Agent Walter's October 23, 2007, Affidavit are

"misleading and completely false":  (1) "Following the initial

matching of the male #1 profile to Williams, confirmatory testing

was performed with existing samples" and (2) "[f]ollowing the

initial matching of the female #1 profile to Audrey B. Kishline,

confirmatory testing was performed with existing samples."

Defendant argues these statements are false because "there were

no existing samples at the Oregon State DNA Database to use for

confirmation."  Moreover, according to Defendant, the Court would

have seen the falsity of Agent Walter's claim that "confirmatory

testing" had been performed if Agent Walter had not intentionally

omitted the statement in the State Police Forensic Laboratory's

September 28, 2007, "Analytical Report" that "DNA reference

standards (four oral swabs) from Robert Williams and Audrey
Kishline need to be submitted to confirm these database matches."

     In his Reply Memorandum, Defendant contends "Agent Walter
was in effect offering the Court a final DNA result that the
Defendant's DNA was found among the robber's disguarded [*sic*]
clothing."  Defendant maintains Agent Walter intended to lead the
Court to believe a final result had been obtained as evidenced by
the fact that he

> sat silent until January 17, 2008, . . . on which date
> the Government [m]otioned the Court for a continuance
> beyond the [S]peedy [T]rial date, successfully arguing
> that all the DNA evidence had not come in, and for the
> need of a DNA standard reference (four oral swabs) from
> the Defendant to be submitted to the Lab to confirm the
> FBI's DNA database matches.

The government, however, contends Defendant misconstrued Agent
Walter's language and Agent Walter's averments were true and not
misleading.

     After the DNA profiles for male #1 and female #1 initially
matched existing profiles in the FBI database, a second test was
run with the samples currently in existence to confirm the
initial match.  The government points out that Agent Walter did
not assert the confirmatory testing met DNA reference standards.
In fact, the government argues it was unnecessary for Agent
Walter to state in his Affidavit that oral swabs needed to be
taken on Defendant to confirm the "DNA standard reference"
because Agent Walter's statement refers only to "confirmatory

testing" with "existing samples."  Thus, according to the government, Defendant has not made a substantial preliminary showing that the Affidavit contains false statements or material omissions that would have affected the probable-cause determination or that Agent Walter acted intentionally or with reckless disregard for the truth.

The Court concludes Defendant has not established Agent Walter falsely stated "confirmatory testing was performed with existing samples."  The Court also finds Agent Walter did not knowingly and intentionally or with reckless disregard for the truth omit that the government had not yet performed the "DNA standard reference" that required four oral swabs from the Defendant.  The Court notes at the time of Agent Walter's October 23, 2007, Affidavit, Defendant had not yet been arrested and it would not have been necessary for Agent Walter to indicate that oral swabs had not been obtained from a still-at-large suspect. Even if this statement had been included, it would not have had a material effect on the finding of probable cause.

**B.   Jesse Reguera's Description of a "White Male"**

Defendant argues Agent Walter intentionally omitted from the October 23, 2007, Affidavit Jesse Reguera's description of the man who he saw in the alley behind 7608 N. Emerald Avenue where the sunglasses and wig were recovered "because it did not match the description of the Defendant, who's [*sic*] apartment Agent

Walter was requesting [permission from] the court to search."
Reguera saw the man for approximately 5 seconds and described him
as white; about 6 feet tall; 170 to 180 pounds; and having long,
dirty, blond, "out-of-bed" looking hair.  Reguera did not notice
the man's clothing or whether he had facial hair.  According to
Defendant, this description was material because "it would have
offered the court a more informed view [on which] to rest its
decision to issue the warrant."

     The Court notes the government was not given an opportunity
to respond to this argument because Defendant raised it for the
first time in his Reply.  In any event, the Court concludes
Defendant has not made a substantial preliminary showing that
Agent Walter intentionally or with reckless disregard for the
truth omitted this information from his Affidavit nor has
Defendant submitted any offer of proof of such intent.  Moreover,
Defendant's contention that Agent Walter sought to avoid
informing the Court that some eyewitnesses described the robber
as "white" is undermined by Agent Walter's statements on page
nine of his Affidavit that "the loan officer, the manager, and
two of the tellers thought the voice sounded like that of a black
man," but two of the tellers said the robber was "not black" or
that he had "olive" skin.  Agent Walter believed this
inconsistency was explained by the "white flesh-toned make-up
found on multiple parts of the robber's disguise...".  Thus, even

21- OPINION AND ORDER

if Agent Walter intentionally omitted or exhibited reckless disregard for the truth on this point, Reguera's description of the man who he saw in the alley was immaterial to the ultimate finding of probable cause because it was merely commutative of other information in the affidavit.

**C.   "Multiple" Convictions**

According to Defendant, Agent Walter exhibited reckless disregard for the truth when he stated in his Affidavit that Defendant's criminal record included, *inter alia*, "aiding and abetting in multiple credit union robberies" and "multiple bank robberies committed in several states."

Again Defendant advances this argument for the first time in his Reply and asserts he only has one conviction for aiding and abetting a credit-union robbery for which he was sentenced in June 1972 in San Diego, California.  Defendant further asserts in his Reply that he only has one conviction for bank robbery, which occurred in Portland in November 1989.

Although the government has not had an opportunity to respond to these allegations, the Court cannot determine whether Agent Walter's statements as to Defendant's criminal history were false absent an offer of proof from Defendant that his criminal record actually reflects single convictions for aiding and abetting and bank robbery.  Moreover, Defendant has not submitted any evidence to support his claim that Agent Walter intentionally

or with reckless disregard for the truth misrepresented
Defendant's criminal record.  Thus, the Court need not decide
whether these alleged misstatements were material to the
determination of probable cause.


## CONCLUSION

For these reasons, the Court **DENIES** Defendant's Motion to
Dismiss the Indictment (#48) and Motion for a *Franks* Hearing
(#49).

IT IS SO ORDERED.

DATED this 17th day of March, 2008.


        /s/ Anna J. Brown
ANNA J. BROWN
United States District Judge


23- OPINION AND ORDER